### McLANAHAN et al. v. MARINE INS. CO., Limited, and three other cases.

(District Court, D. Maryland. July 1, 1922.)

Nos. 937–940.

**1. Insurance ☞101—Insurance broker held not authorized to receive less than full payment of loss.**

Where British marine policies were payable at $4.75 to the pound to an American mortgagee, the London insurance broker, who had, at the instance of his American correspondents, placed the policies, had no authority to accept payment of loss thereunder in pounds, then worth only $3.37.

**2. Contracts ☞162—Effect given to interlined words.**

Effect must be given to words interlined in existing forms, even if to do so requires a rejection of uncanceled provisions of the original draft.

**3. Payment ☞12(5)—Clause inserted in policies, fixing value of English pound in American money, held effective and controlling.**

Marine policies were issued by British insurance companies on an American vessel, on forms in which a loss was made payable in pounds sterling, but at a time when the rate of exchange between British and American money was fluctuating, and in which a clause was written, providing that all claims should be "settled at $4.75 to the pound, which was the rate at which the premiums were paid. *Held*, that such clause must be given the effect intended; that on a total loss of the vessel the liability of the insurers could not be discharged by payment of the number of pounds named in the policies, which at the then prevailing rate of exchange were worth but $3.37 in American money, but that insured was entitled to the equivalent of $4.75 for each pound of insurance.

In Admiralty. Suits by J. Craig McLanahan, ancillary receiver of the West India Sugar Corporation, and the Equitable Trust Company, trustee, against the Marine Insurance Company, Limited, against the Indemnity Mutual Marine Assurance Company, Limited, against the Century Insurance Company, Limited, and against the Employers' Liability Assurance Corporation, Limited. Decrees for libelants.

France, McLanahan & Rouzer, of Baltimore, Md., for libelants.

Lord & Whip, of Baltimore, Md., for respondents Marine Ins. Co., Limited, Indemnity Mut. Marine Assur. Co., Limited, and Century Ins. Co., Limited.

Janney, Stuart & Ober, of Baltimore, Md., and Bigham, Englar & Jones, of New York City, for respondent Employers' Liability Assur. Corporation, Limited.

ROSE, District Judge. As the several policies sued on in these four cases were all upon the same barge, as their phraseology so far as concerns anything here material is substantially identical, as the loss for which the respondents severally admit liability was total, and

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

as the grounds upon which they differ with libelants as to the amount they should pay are common, I think one opinion will suffice.

At the time the policies in question were sued upon, the American barge Detroit, covered by them, belonged to the West India Sugar Corporation, and was subject to a mortgage or deed of trust to the Fidelity Trust Company of Maryland, a corporation, to whom, by their terms, the loss, if any, would be payable. The subsequent vicissitudes in the relation of the mortgagor and the mortgagee, and the financial difficulties in which the former found itself, are of no moment here. The present libelants stand in their shoes. They may be called the owner, and the respondents the underwriters. The latter are all British corporations, engaged in the business of marine insurance. Until some time after the outbreak of the World War, marine policies issued by British underwriters were pound policies, and nothing else; that is to say, they promised, in the event of loss, to pay in pounds sterling. Everybody was then satisfied with that undertaking. For many decades prior to 1914 there had been no more stable a measure of value. When the loss occurred, the liability was ascertained in pounds and turned into the currency of the forum, if suit had been brought upon the policies in a country other than Great Britain, as of whatever date the trial tribunal held the conversion should be made. Then the great catastrophe came, and the value of the pound to other peoples was one of the many things changed by it. American ship and cargo owners were no longer content with the promise to pay pounds. They wanted to know, if a loss happened, how many dollars pounds would mean to them, for there were many indications that dollars would be worth more and pounds less than for more than a century had been the case.

In consequence of this attitude, the British marine underwriters began to insert in their policies on American property a statement that all claims would be settled at so many dollars and cents to the pound, the ratio named apparently being that or about that of the rate of exchange prevailing at the time the policy was written and the premium paid. In this case the phrase was, all claims "to be settled at $4.75 to the pound," or something of that import. The value of the insured barge was stated in dollars, and in nearly all of the policies the amount covered by it individually was given both in pounds and dollars; that is, for example, £1,000 or $4,750. On the other hand, the premiums were all expressed in pounds. They were in fact paid in American dollars at the then current rate of exchange, which was substantially that named in the policy, or a shade higher, $4.77 to the pound.

[1] As has been mentioned, the policies were all payable to the Fidelity Trust Company of this city. When it had been ascertained that the attempts to salvage the barge had failed, and that she was a total loss, the underwriters paid the London insurance broker who had, at the instance of his American correspondents, placed the policies, the amount of the loss in pounds. He turned these pounds into dollars at the then rate of exchange, namely, $3.37, and transmitted to the owner that sum, or $3,370 in case of a policy for £1,000 or

283 F.—16

$4,750. The owner declined to receive it. The underwriters refused to take it back, claiming that the acceptance of their pound payment by the London brokers closed their transaction. There is nothing of substance in this contention. If the owner was entitled to more, the broker had no authority to accept less.

What had it a right to demand? This question was put, in the first instance, at nisi prius to Mr. Justice Bailhache, then to the Court of Appeal, and finally to the House of Lords, in the case of Howard Houlder & Partners, Ltd., v. Union Marine Insurance Co. A manuscript copy of the opinions delivered in the House of Lords on the 27th of March last has been furnished me. The policy there sued on was not identical with those with which we are concerned. Arguments in support of the underwriter's contention, possible there, could not be made here; but, after all, they were but mere makeweights. The substantial controversy was the same on the other side of the Atlantic as on this, and, with but one judge dissenting, it was resolved in favor of the underwriters. It was held that the policy was one payable in pounds, and that the tender of the number of pounds named in it exonerated the underwriters. Every one of the learned lords and judges recognized that no middle ground was possible. The policy called either for pounds or for dollars. A pound will not become the equivalent of $4.75 by saying that it shall be. If, when payment comes to be made, a pound is worth less than $4.75, either the underwriter must pay more than a pound, or the owner will get less than $4.75. In the instant case, if the underwriters need give no more than a pound, the owner will get but $3.37. On the other hand, if he is entitled to $4.75, the underwriters must hand him 1 pound 8 shillings 2 pence, or thereabouts.

[2, 3] An inspection of the policy shows that the reference to dollars is thrust into a form originally intended to provide for a payment in pounds, and in them alone. When the new matter was injected into the old, the old was left unchanged; but the new was not inserted without an object. So far as the owner was concerned, it does not seem that what that object was could have been in doubt. It is true that in the English courts there was suggestion that the added phrases might subserve some other end than turning the policy into one payable in dollars; but no one of the learned men who gave their opinions in the case went so far as to say that he really thought that, when the parties put in the troublesome words, they had any such small matters in mind. They all admitted that it was possible, and it is not unfair to suggest that they thought it was probable, that the American owners may have wanted a dollar policy; but they said that, if one wished to convert a policy which had been payable in pounds into one payable in dollars, he must do it so clearly as to leave no reasonable room for question as to what he meant. Doubtless so; but had he not done it here, in spite of the fact that the policies, as amended, might be hard to construe if they were read as a whole, without any intimation as to what part of them was old and what was new, and in ignorance of what was going on upon this war-smitten planet at the time the additions were made. No citation of authority is required for the propo-

sition that in this country, at least, effect must be given to words interlined in existing forms, even if to do so requires a rejection of uncanceled provisions of the original draft.   The House of Lords, moreover, assumed that the additions were made by the owner, and any ambiguity in the policy should be resolved against it.

Is that quite accurate in fact?   The owner, it may be safely assumed, was not willing to take the old form of policy, and the insertions were made because he was not; but, after all, they were written in by the underwriters, and the policies, in the shape in which they were given to the owner, were of their drafting.   Are they not within the familiar rule that documents must be construed against those who make them?   The owner asked for something which might protect him against the fluctuations of exchange, and the underwriters gave him a document altered from the old form, and in which the alterations seemed to him to furnish what he sought, and which do so, unless they be given a construction making them either meaningless or confining their operation to contingencies which, at the time, there is no reason to suppose any one had in mind.

I am persuaded that the owner's position is correct, and that he is entitled to a decree for $4.75 for every pound for which each underwriter is severally liable.